## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 21 2017, 9:15 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Steven Knecht
Vonderheide & Knecht, P.C.
Lafayette, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| B.P., *Appellant-Respondent,* <br><br> v. <br><br> J.E.S., by Child's Next Friend S.S., *Appellee-Petitioner* | June 21, 2017 <br><br> Court of Appeals Case No. 12A02-1702-PO-317 <br><br> Appeal from the Clinton Superior Court <br><br> The Honorable Justin Hunter, Judge <br><br> Trial Court Cause No. 12D01-1611-PO-793 |

**Baker, Judge.**

[1] B.P. appeals the protective order issued by the trial court, which prevents him from directly or indirectly contacting thirteen-year-old J.S., posting about her on social media, or encouraging anyone else to communicate with her on his behalf. B.P. contends that the trial court's findings are insufficient and that the evidence is insufficient to support the order. Concluding that the findings and the evidence are not insufficient, we affirm.

## Facts

[2] J.S. was born to S.S. (Mother) in (approximately) 2003. Mother was unmarried at the time of J.S.'s birth, and paternity has never been established. In 2012, Mother's husband legally adopted J.S. After the adoption occurred, B.P., who believes he is J.S.'s biological father, attempted to have the adoption set aside. He was unsuccessful. He also filed a paternity action after the adoption was final—that action was dismissed.

[3] Beginning sometime in 2012, B.P. began a course of conduct designed to publicly claim a status as J.S.'s father. In 2012, he approached Mother and her children in a Wal-Mart and began "scream[ing]" and "yell[ing]" at her. Tr. p. 38. Also beginning in 2012, B.P. began driving by Mother's house, up to and including the summer of 2016. *Id.* at 39. In March 2013, he went to a softball game in which J.S. was playing. J.S. was in the field and he yelled to her, "I'm your real dad. I'm your father." *Id.* at 34. She became distraught, started crying, and had to leave the game. She looked "panicked" and "scared." *Id.* at

35.  Since that time, J.S. has almost totally withdrawn from all organized sports.

[4]    B.P. has a public Facebook account.  Since 2013, he has posted multiple times a week about J.S.  *Id.* at 13 (B.P. testifying that he posts about J.S. "probably everyday almost").  The following is a small sample of his nearly daily posts:

- "love my daughter, she is more of me than her mother allows her to know and see . . . ."  Appellant's App. Vol. 2. p. 14.
- "love my daughter, I hope she has this urge to want to get to know me instead of taking the false truth her mother has raised her on when it comes to me . . . ."  *Id.*
- ". . . I will not stop until I take my last breath or until you [Mother] decide that the route you have been going down leads to nowhere but heartache and disappointment for our daughter . . . ."  *Id.* at 11.
- "[S.S:]  You can act like a cockroach when the lights turn on whenever I am around but it still doesn't change the fact that I am [J.S.'s] father . . . . anyone who is friends with her and I can share this so she can see!"  *Id.*
- "love my daughter, I will never give up on wanting to get to know you and for you to actually get to know me . . . ."  *Id.* at 13.
- "happy birthday to my beautiful daughter, she is my greatest creation," with a photograph of J.S. at a school field trip that B.P. did not attend; Mother did not send him that photograph.  Tr. Ex. 2.

(Punctuation, spelling, and grammar original.)  J.S. was "very aware" of B.P.'s constant Facebook messages about her, as her friends at school and other people frequently brought it up to her.[1]  Tr. p. 36.  In fact, she felt as though she

---

[1] Mother did not permit J.S. to have a Facebook account.  Mother has a Facebook account, but has blocked B.P. and several other individuals associated with B.P. from accessing her profile.

was "constantly having to defend herself." *Id.* at 48. Around Thanksgiving 2016, J.S. asked Mother if B.P. had posted anything about her that day, and when Mother checked and replied affirmatively, J.S. asked to see it. After reading it, "[s]he sat there for a second just looked down at it and she got up and left the table. She's in the bathroom crying. Bawling and asking why. And I mean I just I hugged her and did the best that I could to comfort her." *Id.* at 36.

[5]  In November 2016, B.P. sent J.S. a message on Snapchat. Once she realized who he was, she asked him to leave her alone. B.P. responded, and J.S. then sent him the following message:

> your brother and you are creepy so stay out of my life and take down that white [board] in the [barber] shop[2] and stop telling landen and my other friends that your my dad bc you are obviously nothing to me and I am scared most of my time of you, you're the main reason why I quit softball bc you scare me the living crap when you showed up at one of my game I can't go anywhere or be free bc [you] have to stalk me and guess what F*CK OFF"

Tr. Ex. 3 (punctuation, grammar, and spelling original). After that exchange, J.S. was "upset, crying, tearful, angry" and "asking why why why do why do I have to go through this every day. Why can't he just leave me alone. . . . [I]t's changed her a lot. She's more withdrawn. Won't really talk as much. Doesn't

---

[2] B.P.'s brother owns a barber shop. The record does not reveal the contents of the white board in the barber shop to which J.S. referred in this message.

ask to go out as much." Tr. p. 31. J.S. described her reaction to the interaction as follows:

> I was panicking. Didn't know what to do. . . . I told him that he needed to leave me alone. I went that I didn't want nothing to do with him. That he was never there for me ever. A date even when the day I was born. And my mother's told me that before. He just kind of scares me.

*Id.* at 69-70.

[6] Throughout the years, Mother has asked B.P. to stop communicating or attempting to communicate with J.S. "[m]ultiple times. I've asked him to leave her alone. She doesn't want anything to do with him. . . . It doesn't matter what I say or what I ask. He continues to do it." *Id.* at 32.

[7] As a result of B.P.'s constant barrage of social media posts about J.S. and Mother, Mother has "totally had to change the way I . . . do things now." *Id.* at 37. Whereas in prior years, Mother had a Facebook account and would often post pictures of her children to her account, "I don't do that anymore. Especially of [J.S.] . . . Because every time I post something of her somehow or some way he ends up with it." *Id.*

[8] Mother also testified that B.P.'s behavior "scares" her:

> . . . I don't know what . . . he's gonna do. . . . I could be anywhere and when I'm by myself when I have my children with me and I mean I tried with all to avoid him at all costs. I try not to go to places that I think he might be. Or you know when I got into the Wal-Mart I'm always scanning the parking lot looking

for vehicles that I've known him to drive. And so if he's there I'm not gonna go in.

*Id.* at 38. She further stated, "I just get a really sick feeling whenever I'm in somewhere and . . . he's there cause I . . . just don't know what he's gonna do. It's just . . . scarey [sic] just because everything that's happened over the last four years." *Id.* at 39.

[9] And as for J.S., Mother "can't ever get her to do sports anymore. We used to sign her up for all sorts of sports and she . . . won't do them. She refuses. . . . And that's not like her. . . ." *Id.* at 37-38. J.S. "won't go out of the house. Because she's afraid that she's gonna run into him. She won't go to sporting events. She won't even go to a basketball game with her friends because she's afraid that he's gonna be there." *Id.* at 49. J.S. testified that she is scared:

> J.S.: I have been scared most of my life of him. I haven't been able to speak what is on my mind. And that day [the day that J.S. sent him the Snapchat message] . . . I just wrote what was ever on my mind. Just told just to tell him how I felt. So he would understand to leave me alone. And I didn't want anything to do with him.
>
> ***
>
> Attorney: Okay. So are you generally aware that [B.P.] regularly um puts items about you on social media?
>
> J.S.: Yes.

Attorney: Okay. And how does that make you feel?

J.S.: Really scared that I'm put out there on social media. And that everybody will intentionally come up to me and like say something about him to me. Like my friends at school. It doesn't really make me feel all that good about myself.

*Id.* at 73.

[10] B.P. agreed that it is "possible" that "a little girl could reasonably be scared by [B.P.'s] daily communication about her[.]" *Id.* at 61. And while he stated that many of his Facebook posts are an attempt to express his thoughts to the world, he also acknowledged that some of his posts are designed to communicate directly with her: "I'm basically letting her know what I feel and the thoughts that I have." *Id.* at 63.

[11] On November 17, 2016, Mother, on behalf of J.S., filed a petition for a protective order against B.P. On November 18, 2016, the trial court issued an ex parte protective order. B.P. requested a hearing, which was held on January 3, 2017. A final protective order was granted on January 10, 2017, and prohibits B.P. from the following conduct: (1) threatening to commit or committing acts of stalking against J.S. and Mother; (2) harassing, annoying, telephoning, contacting, or directly or indirectly communicating with J.S.; (3) being near J.S.'s school or home; (4) communicating with J.S. through any social media; (5) communicating any information regarding J.S. on any social media platform; and (6) encouraging anyone to communicate with J.S. on his

behalf and/or post any information to any social media platform regarding J.S. B.P. now appeals.

# Discussion and Decision

# I. Findings

[12] B.P. first argues that the trial court's findings are insufficient to support its judgment. He directs our attention to *Hanauer v. Hanauer*, 981 N.E.2d 147, 148 (Ind. Ct. App. 2013), in which this Court held that "[p]rotective orders are in the nature of injunctions. Therefore, in granting a protective order the trial court must *sua sponte* make special findings of fact and conclusions thereon." (Internal citations omitted.) According to B.P., the trial court's findings in this case did not meet this standard.

[13] The trial court's findings read as follows:

    a.    [B.P.] filed a timely Request for Hearing pursuant to Indiana Code section 34/26/5/10(a); and/or,

    b.    N/A

    c.    [J.S.] was present at the hearing and [B.P.] was present.

    d.    This order does protect an intimate partner or child.

    e.    [B.P.] had notice and an opportunity to be heard.

    f.    [B.P.] represents a credible threat to the safety of [J.S.] or a member of [J.S.'s] household.

g.     [J.S.] has shown, by a preponderance of the evidence, that stalking has occurred sufficient to justify the issuance of this Order.

h.     [B.P.] does not agree to the Issuance of the Order for Protection.

i.     The following relief is necessary to bring about a cessation of the violence or the threat of violence.

Appellant's App. Vol. 2 p. 31.

[14]    In *Hanauer*, the trial court's findings were virtually identical to the trial court's findings in this case:

> the trial court found that "domestic or family violence, [or] stalking[ ] . . . occurred sufficient to justify the issuance of [the Protective Order]." The court further found that Husband "represents a credible threat to the safety of [Wife] . . . or a member of . . . [Wife's] household." And, with these findings, the court concluded that Wife was a victim of domestic violence and entitled to the issuance of a protective order.

981 N.E.2d at 149 (internal citations omitted). This Court then noted that "[o]ur review of the record supports these findings and conclusions. Therefore, we find no error in the issuance of a protective order." *Id.* at 149-50. Another panel of this Court later considered *Hanauer*, observing that "even though findings are required to grant a petition for a protective order, the findings need not be extensive. In *Hanauer*, the trial court's 'findings' were not extensive but

were adequate for appellate review of the trial court's decision . . . ." *Costello v. Zollman*, 51 N.E.3d 361, 365 (Ind. Ct. App. 2016), *trans. denied*.

[15] In the case before us, as in *Hanauer*, the trial court's findings were not extensive. As aptly put by the *Costello* Court, however, the findings are adequate for appellate review of the trial court's decision. Therefore, we decline to reverse for this reason.

## II. Sufficiency

[16] Next, B.P. contends that the evidence supporting the protective order is insufficient. We apply a two-tiered standard of review to cases in which the trial court entered findings of fact and conclusions thereon. *Hanauer*, 981 N.E.2d at 149. First, we determine whether the evidence supports the findings, and second, whether the findings support the order. *Id.* We will reverse only where there is no evidence supporting the findings or the findings fail to support the order. *Id.* We will not reweigh the evidence and will consider only the evidence favorable to the order. *Id.*

[17] Indiana Code section 34-26-5-2(b) provides that a parent may file a petition for an order of protection on behalf of a child against a person who has committed stalking. "Stalk" means "a knowing or an intentional course of conduct involving repeated or continuing harassment of another person that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually causes the victim to feel terrorized, frightened, intimidated, or threatened." Ind. Code § 35-45-10-1. "Harassment" means

"conduct directed toward a victim that includes but is not limited to repeated or continuing impermissible contact that would cause a reasonable person to suffer emotional distress and that actually causes the victim to suffer emotional distress." I.C. § 35-45-10-2. For a trial court to issue a protective order, the petitioner must prove by a preponderance of the evidence that stalking has occurred.[3] *C.V. v. C.R.*, 64 N.E.3d 850, 853 (Ind. Ct. App. 2016).

[18] In this case, J.S. was approximately nine years old when B.P.'s course of conduct began, and approximately thirteen years old at the time of the protective order hearing. Over the course of those four years, this young girl and her family had to cope with the following incidents:

- In 2012, B.P. approached Mother and her children in a Wal-Mart and began screaming and yelling at her.
- Also in 2012, B.P. began to drive by Mother's house, up to and including the summer of 2016.
- B.P. attended one of J.S.'s softball games and yelled to her as she was playing on the field, "I'm your real dad. I'm your father." Tr. p. 34.
- He has been posting on his public Facebook account nearly *every day for three years* about J.S. When he posts, nearly four hundred people who live in Clinton County—where J.S. also lives and goes to school—see his posts in their Facebook news feeds. *Id.* at 64.
- As a result of B.P.'s constant Facebook posts, J.S. "constantly ha[d] to defend herself" when friends and others brought the issue up to her. *Id.* at 48.
- In November 2016, B.P. sent J.S. a message on Snapchat. Once she realized who he was, she asked him to leave her alone. He responded,

---

[3] There are, of course, other ways to prove that a protective order is warranted, but stalking is the only way that is relevant to this case.

and then she sent him a strongly worded message telling him that "I am scared most of my time of you" and "you're the main reason why I quit softball" because "[you] have to stalk me[.]" Tr. Ex. 3.

After the times in which B.P. contacted J.S., or she saw one of his Facebook posts about her, she would become "upset, crying, tearful, angry," tr. p. 31, and feel "panicked" and "scared," *id.* at 35. As a result of B.P.'s conduct, J.S. has stopped playing organized sports, is reluctant to leave the house, and has become withdrawn and generally changed her behavior. *Id.* at 31, 37-38, 49. Mother is also frightened, explaining that she tries "to avoid him at all costs," and when she goes to Wal-Mart, "I'm always scanning the parking lot looking for vehicles that I've known him to drive." *Id.* at 38. Over the years, Mother has asked B.P. to stop communicating or attempting to communicate with J.S. multiple times. But "[i]t doesn't matter what I say or what I ask. He continues to do it." *Id.* at 32.

[19]     For a protective order to be warranted, there must be sufficient evidence supporting the trial court's finding that B.P. committed stalking against J.S. and her family. Our review of the record supports the following conclusions: (1) B.P. acted knowingly or intentionally; (2) B.P.'s conduct directed toward J.S. included repeated or continuing impermissible[4] contact; (3) that contact would cause a reasonable person—in this case, a reasonable minor child—to

---

[4] B.P. is an adult repeatedly contacting and posting about on social media a young girl with whom he has no legal relationship. Her mother demanded that he stop; he refused. The contact was unquestionably impermissible.

suffer emotional distress; (4) that contact actually caused J.S. to suffer emotional distress; (5) the repeated and continuing harassment would cause a reasonable person—in this case, a reasonable minor child—to feel frightened, intimidated, or threatened; and (6) the repeated and continuing harassment actually did cause J.S. to feel frightened, intimidated, or threatened.

[20] Some of B.P.'s conduct was in the nature of direct communication—accosting Mother at Wal-Mart, yelling at J.S. during her softball game, and contacting J.S. through Snapchat. Some of B.P.'s conduct was in the nature of indirect communication—nearly daily Facebook posts about J.S., which he knew would be seen by nearly four hundred people who live, work, and go to school in J.S.'s community, and some of which he specifically intended to be read by her. In either case, the trial court did not err by finding that his conduct amounted to stalking or by issuing the protective order. B.P.'s arguments to the contrary amount to a request that we reweigh the evidence and second-guess the trial court's assessment of witness credibility—a request we decline.

[21] The judgment of the trial court is affirmed.

Barnes, J., and Crone, J., concur.